And our next case is number 232184, Power2B v. Samsung Electronics. You can just stay where you are. Okay, Mr. Daniels. Thank you, Your Honors. My name is Adam Daniels, and I'm representing Pellant Power2B in this matter. Your Honors, the main question here that unravels all of the issues comes down to unsupported testimony. And specifically, testimony by Petitioner's expert, Dr. Peterson, to define an input area in a reference called Ishii, in Ishii alone. So this is just to give you a little bit of context for where I'm going. So the claim to invention here... The claim to invention here generally has an input option and an object, which is a stylus, an input area, and a sensor array positioned outside of the input area. And the sensor array is further operative to provide an output indication regarding an electromagnetic radiation pattern. And so if you look at Figure 4 of the patents, you can see that there's a few different ellipses that are being shown. And those ellipses will correspond to the radiation from the pen on the surface itself. And so those ellipses are circles. That's the radiation pattern. And as the orientation of the pen or the distance of the pen moves, it'll create an elongated circle or ellipse, or it'll have a bigger circle altogether. So the size and the shape of the dimensions of that elliptical spot can then be used to calculate the relative position of that input object, meaning the stylus. So what's important here is during prosecution, the two references that are being cited and the two references that were applied, Berg in particular, was considered a number of times by the Patent Office. And Berg also makes a lot of references to Ishii and describes Ishii as nothing more than an example integrated display. And so in the context of the asserted patents, the interpretation of the input area was the display for Figure 3. And this is uncontested. The parties don't dispute this. The display in Figure 3, which I believe is Display 12. The display in Figure 4, which again I believe is Display 12. The display in Berg. But when it comes to Ishii, which again provides an integrated display, the petition had to rely upon unsupported testimony. And that unsupported testimony specifically says that a poseda would have understood that the input area in Ishii is defined... I'm sorry, the wave So even just from a high-level point of view, we have an integrated display where the handwriting happens. You're writing on the display with a stylus. That's where the input area is. You have the handwriting that's on Berg. That's where the input area is. And then on Ishii where there's handwriting input, which is shown in Ishii's Figure 5, somehow we have a new definition for Ishii's input area. And that was in the petition to start. And so as a threshold matter, that testimony is unsupported. And we cited the Arendi case, it was Arendi versus Apple case. It's unsupported testimony to supply a limitation that's missing in the reference. So again, we added the limitation, which was a sensor array positioned outside of the input area to distinguish over Berg's integrated display. And not only Berg's integrated display, we also provided Ishii to the Patent Office. And throughout Berg, Berg references Ishii as nothing more than an example integrated display. Does this argument still apply even if we agree with the Board's construction of input area? Yes, Your Honor. This is a threshold issue. Regardless of claim construction, this is using expert testimony to wholly supply a missing limitation. And that limitation is missing even if we adopt the Board's construction of input area. Yes, Your Honor. And so one thing that I also want to point out and note is when it comes to this testimony. This testimony appears in the petition. I'm looking at Appendix 234 to 235. And the petition cites to this expert testimony at paragraph 113. And I also provided in our briefing a side-by-side comparison. And I believe it was in our opening brief at page 43. I think this paragraph is the paragraph that finds this missing limitation in Ishii. And the paragraph is directly copy and pasted. And there were about five sentences. The petition copies four sentences. And the fifth sentence is actually an admission on the record, which I'll discuss in a minute. But in the context of this unsupported testimony, it begins by stating Ishii discloses a photo sensor formed in an end portion of the waveguides. And the reason why that's important is the petitioner has annotated the waveguides. So this is the annotated figure nine. The petitioner annotated the entire length of those waveguides as the alleged input area. So Ishii teaches that a photo sensor, which Ishii describes as a functional- That could define, I believe, a sensing area. But when it comes to the input area, Ishii provides figure five, which shows where the handwriting inputs are. So you agree that, in other words, you agree that in order to have an input, you have to have overlap between the X and the Y guides, right? So to be clear, I agree that that overlapping intersection would provide part of a sensing area. But Ishii detects the entire length of Ishii's waveguide detects the light. So Ishii's waveguide as a structure, so this is optical sensing, as a structure, it has a very specific dimension and it's sensitive to attenuate very specific wavelengths of light. So the entire waveguide itself would define an area that it could sense the light. But when it comes to the input area, the display is where the handwriting happens. The display is where those inputs happen. And so again, just to pull this back into proper context, the parties do not dispute. The display, with no respect to the underlying structures, the display is the input area in the context of the patents, the specification. The display is the input area in the context of BIRD. And again, that's without respect to any of the physical dimensions of BIRD sensors. BIRD's entire display, which Petitioner annotated multiple times, is the input area. And then when you turn to Ishii, we have a handwriting input area, and the only thing that would support the definition for Ishii's testimony. So continuing on with Dr. Peterson's statements, the first thing that I noted was Ishii actually teaches, even taking a step aside. So we have this input, the larger issue is unsupported testimony. We have a secondary issue, which is the display is the input area. And we're not saying that, to be very clear, Power to Be's position is not that the display is the input area for all cases. We're talking about a very specific context for the integrated displays disclosed in Figure 4 of the specification, which both parties agree the claims do not encompass, the context of BIRD's integrated display and the context of Ishii's integrated display. And so I'll note that even if we set aside the display being the input area, the waveguides, assuming the waveguides define the input area according to what Petitioner annotated, Ishii teaches the photosensor, a single photosensor, which is a functional circuit, is inside of each individual waveguide to provide respective X and Y information. And then some other additional processing circuitry will accumulate all of those outputs from those waveguides and then determine an X and Y position. But the photosensor, Ishii very clearly states, is in the waveguide. And in fact, Ishii provides a number of citations that say it's in. So even if the display is not the input area, which it is, even if we go with Petitioner's definition of the input area, which is the unsupported testimony, Ishii still teaches that the photosensor, which is the alleged sensor array, is in the actual waveguide itself. It's not outside, which is what the claims require. And another thing that I'll note, and we mentioned it in our briefs, I want to make the record very clear. There is a very big difference between the sensor portion and the photosensor. So Ishii, throughout its entire specification, discusses a photosensor, which is manufactured and fabricated at the same time as the waveguides. The waveguides and the photosensor are made by either additive or subtractive processing, kind of like a semiconductor. So you have a silicon substrate, and you can etch away parts of that silicon substrate to create a display panel, and you can form the waveguides. And during that process, the photosensor is inside of the waveguide, every one of those waveguides. The sensor portion is a different thing. The sensor portion could refer to handwriting circuitry, it could refer to a lot of things. There was an improper citation in this testimony, and I'm referring to the second sentence of Dr. Peterson's testimony in paragraph 113, this is at appendix 351. In the second sentence, Dr. Peterson says, quote, Ishii discloses an optical waveguide 36, an X or Y sensor portion 34, and a Y or X sensor portion 35, formed in an end portion. That's not correct. Ishii, when you look at that paragraph, that citation of Ishii, Ishii says that that X or Y sensor portion and the waveguides are just formed in between the picture elements. Ishii is not talking about a photosensor there. Petitioner's expert is relying upon the sensor portion to represent the position of the photosensors, but Ishii uses a different word. Ishii says a photosensor is formed in, in each waveguide, because that's how it operates. The other thing that I want to quickly correct on the record is this references to a sensing patent embodiment. This is in our briefs, but Samsung, as well as the board, relied upon this sensing patent embodiment and stated that we relied upon the sensing patent embodiment during prosecution to support the issued recital. We did not. That's incorrect. The correct amendment where we actually relied upon the disclosures was referencing figure three, and that was an amendment on June 12, 2009. That's at Appendix 3688. That was the amendment that actually corresponded to the issued claim recitals, so there was no sensing patent reference. That's another error on the record. Okay, so getting back to this larger issue about what the input area is in the context of these references, both parties again agree that BIRDS Figure 1 is the input area. I'll read you a quote. This was from Samsung during oral argument in the proceedings below regarding BIRDS input area. Quote, it's the writing surface where the pen is used to input information. If that's correct, then why isn't Ishii's writing surface where the pen is used to input information the input area? If you use that definition that they explained during their oral argument with BIRD as the writing surface where the pen is used to input information, to then use that on Ishii, you result with Ishii's display. Again, figure five shows the handwriting going over the display. That's the input area. Are you still challenging the board's interpretation of input area? Yes, Your Honor. The other thing that I'll note about the construction that the board entered for the input area, it just rearranged the words. The board's actual support for that, saying the input area is the area of input, doesn't resolve this issue. That came from our expert testimony where he specifically said, I am not talking about a claim construction, but the input area, it's an off-the-cuff remark, is the area of input. But he specifically said, I'm not talking about a claim construction, and that was just his testimony. Even if we adopt the board's construction, our expert, under his understanding of an input area, comes to a very different conclusion than their expert applying this alleged definition. Neither of which, both of those definitions were not proposed to the board at all. With that, Your Honors, I would also like to address Claim 20. In Claim 20, there was no support. No, no. You've got to wait. Sorry, Your Honors. I jumped the gun. Thank you. Okay, Mr. Fink. May it please the Court, William Fink for Appellee, Cross-Appellate, Samson. I'd like to make a few points on his opening argument. All throughout this IPR, there's been this claim that Samsung is agreeing with Power to Be on a number of things, and it's been kind of shifted over time, but the gist of it is that because Eishi has a display that also has an input area, that we agree that the display is the input area, or the input area is the display. Therefore, the sensing portions of the display, or the sensing array portion of the array, must be also inside the input area. And so it's kind of a logical fallacy. The input area takes input. This is what their expert agreed on. It takes input from an input object, and it directs it, as the board found, Dr. Peterson testified, it directs it to peripheral light sensors. And that's shown in Figure 9, which is marked up at Paragraph 113 of Dr. Peterson's Declaration, Appendix 351. And the red area, 34, 36, is a sensor array. Now, this is clearly not drawn to scale. It's a mock-up that's showing the waveguides in an orange color and the sensors in a red color. And then it talks about... Which page is this in? This is Appendix 351. Just so you know, we don't have the colors that you have in our appendix. Oh, I'm sorry, Your Honor. So the rectangles at the end of Figure 9, the rectangle that's labeled 34 would be the sensor, and then the sensor array, and then the waveguides are the amber-colored, or sorry, sorry, Your Honor, the perpendicular stripes. Okay, so what they're saying is that if the waveguides are the input area, the input area continues into the rectangular area, so the rectangular area of the sensor array is not outside the input area. That's their argument. That is one of their arguments. There's a number of arguments. And the board at 25, Note 12, says no, no, the ends of the guides that are on top of the sensor array are not input areas, right? That's correct, Your Honor. And so what's the basis for that? So the board considered their argument in Footnote 12, and as an alternative, made an alternative finding. That footnote is cited at Appendix 234. I'm sorry, let me find the reference to the petition. So what the board said was that the waveguides define the extent of the input area, and what it cited was the petition at Appendix 234. And then it said the light, this is according to the board at Appendix 29, the light from the input object is collected by the waveguides and conducted or guided to their ends. So that's a finding the board made. The light is guided to their ends. And then, addressing the argument that my colleague made here, the board said that, to be clear, we refer to the waveguides, as the petitioner does, which is those portions that conduct light to their ends. And then they said, we view the peripheral light sensors and photosensing circuits connected to the waveguides to be separate from and not part of the waveguides. So they're saying that the overlap area between the waveguides shown in Figure 9 and the rectangular area, the sensor array, those aren't part of the input area, right? Correct. That's correct, Your Honor. And the board based that on Ishii's other disclosures, which I'll refer you to, which the most important one is at Appendix 27 and 28, where the board discussed these or addressed these arguments. And the board was persuaded in particular by the, and this is in our red brief at page 44, and citing Appendix 28 of the final written decision. The board had reproduced the block quote, the sensor portions 34 and 35 are positioned at the end of the waveguides so they can receive light that is leaked from the end of the waveguides. That's a quote, that's a direct quote. And the board, we also cited Appendix 746, paragraph 76 through 79 for that. So that was the basis for the board's finding that regardless of how you interpret Figure 9, if you can interpret it a couple different ways, but the bottom line is that you have light leaking from the end of the waveguides down to the substrate where the photo sensors reside. And that is where the input area ends. So you have the light gathering portion of the waveguides and then you have the photo sensing portion. And the board weighed all of this evidence, what's important is the board weighed all of this evidence including all of the testimony of Dr. Cairns, that's Power to Be's expert, Dr. Peterson, Samsung's expert, and found that consistent with the notion that the input area extends to the end of the waveguides and no further. And whether there's a display that may exceed the boundaries of the input area by a very small amount, it's not really discussed by either expert, is really irrelevant. The display displays light, the input area collects light and they don't have to be coterminous. There's no requirement. This doesn't come up because Power to Be's expert didn't really try to, they didn't try to make any of this. Power to Be's, if I remember correctly, makes the argument that if this is how you're going to interpret input area, then this limitation will always be satisfied, right? I'm sorry, Your Honor, could you repeat that? I believe that they argue that if this is how you're going to interpret input area, then the limitation requiring that the sensors or waveguides be outside of the input area will always be satisfied. That is one of the arguments they make. So my question is, what is your response to that, in particular? Well, in the context of Ishii, that's true because you have light gathered by these waveguides. Can you think of a context of a different reference where it wouldn't be true? Where it wouldn't be true that the input area is always outside? Well, I think if you look at the patent, figure three has a display and then it has sensors arrayed outside the display. And so in that case, the sensors are... I'm not sure that really answers my question. I'm sorry, let me... I was setting the display aside, I guess, but just saying if input area is so broad as to include any place where you can provide input, of course, the sensors... Can you think of any examples where the sensors would be within the place where the input... Yes, I mean, the patent at figure four provides examples of where you have a sensor array that's actually overlaying the input area and is coterminous with the display. I mean, it's figure four of the patent and it's described as the photo sensors being above, under, or integrated into the display. So that's exactly the figure four embodiment. They would claim that's not covered because it's coextensive. That doesn't really make any sense. That's an example of where the display and the input area are perfectly coterminous. If there are no further questions on the appeal, I'd like to turn to the cross appeal. So, Your Honors, the board found all 26 challenge claims of three patents invalid except for claim 20 of the 364 patent. And just to orient ourselves, the board focused on one part of the claim, the last part of claim 20 in the 364 patent that says, and generating control signals by the input circuitry. The board said Samsung did not address it, but Samsung did address it. It did what petitioners routinely do in these cases with large groupings of similar claim limitations. It groups similar claims together and cross-referenced them. And in this case, at appendix 5474 to 5476 of the petition, Samsung grouped claims 6, 7, 13, and 20, which have very similar claim limitations. Samsung said, or in the case of claim 20, it depends from claim 17. And by cross-referencing claim 13 and claim 6 grouped together, it addressed the detecting thresholds intensity portion of claim 20, which is also similar to the output indication of intensity. So my concern with this argument is that you concede the language is similar, maybe substantially similar, but not identical to the language of any of those other claims you expressly addressed. And I don't see where you even argued to the board, hey, we're relying on what we're cross-referencing because it is so similar to this language that only appears in claim 20. Can you help me with that? Yes. Well, I disagree with part of what you say, Your Honor. Samsung addressed in several pages at 5475 and 5476, it actually addressed the intensity, the difference between claim 13's detecting thresholds of intensity, I'm sorry, claim 13's output indication of intensity, claim 13, and then address the language of detecting thresholds of intensity. So Samsung addressed the threshold portion. But how about the generating control signals? The generating control signals.  So what Samsung said in claim 13 is when you have the output of the intensity that you create a signal that is sent to the microprocessor 16 in GAVA. Okay. And so that's the portion that Samsung intended. And granted, it's not in hoc verba, this is the generating control signals. But that's the only signal that Samsung talks about in the dependent claims. What is the control signal? Well, that's a good question because the patent doesn't actually tell us what the control signal is. It's undefined. It only shows up in claim 20 of all three patents that are in this family or in this claim set. It only shows up in claim 20 generating control signals. And then it doesn't actually do anything other than it's untethered to any other claim limitation. But what Samsung said is the, or what Samsung understood it to mean was the same as the input of a circuitry that generates an electronic input. So that is claim 17F. I guess, is the question here that we're dealing with whether the control signal is different from other inputs? Well, that's the point of our argument is we don't know because the board didn't make any findings about what was missing. The dissent did. There's two problems with the board's decision. Number one is it doesn't actually address control signal and say, well, we think this means something and you didn't talk about it. And on the other hand, it didn't say, it didn't actually address the evidence in claim 13 and the other claims, 6 and 7, or 17F. It didn't say, okay, we kind of see there's evidence here. And I think what Judge Melvin's dissent is, shows that at least one judge saw substantial evidence that the claim is taught, also saw that the control signal doesn't add any further, doesn't define anything further over. Did you ever say in your petition the control signal doesn't add anything? We did not. To be fair, Your Honor. You just completely did not address this limitation, right? Well, we believe we did by putting them together. But, yes, in retrospect, again, this is, in retrospect, had the board asked us, we could have said that and we could have addressed this. Well, I think the patent owner response called this out, that you missed this limitation in your petition. Did they not? The patent owner response did call this out. Did you fix it in the reply? And I don't think we went back and addressed generating control signal, because I think our view was it was clear from the teachings of Claim 13 that there's an output signal. But did you even say that much to the board in your reply? No, we didn't. No, Your Honor, we didn't. So, you know, I would conclude by just saying the board left this devoid of a record of whether control signal means anything and whether or not the dissent is wrong, that there is substantial evidence to support a finding that the control signal is present. Okay. Thank you. Mr. Daniels. Thank you, Your Honors. So what's a control signal? I think a control signal is what it says. It's a signal that would, I mean, I apologize. I'm not trying to be rude. But I believe a control signal is something that would control, provide some sort of control to the device itself. Well, doesn't Claim 13 disclose a control signal then? Okay. All right. So Claim 13, as I'm looking at it, it's providing an output indication as I read it. What? Claim 13 of the 364 patent, Your Honor. Yeah. Yep. So as I look at Claim 13, I don't see a control signal here. Well, no, but my question is if control signal just means any output, then Claim 13 shows a control signal. And the reference, the cross-reference to Claim 13 would show the existence of a control signal. That's the problem. Well, if a control signal could mean anything, Okay. So I don't agree with the proposition that a control signal could mean any kind of output. I believe that by reciting the words control signal that they Well, what does it mean? I mean, you haven't given me any indication that it means anything except output. My understanding of a control signal is that it would be a signal that would provide some sort of control to the device itself. So, for example, if Well, doesn't Claim 13 show that? There's an output that I don't see that the output provides any sort of additional, conveying additional instructions. The output of 13, as I see it, is it is an output indication of the intensity of radiation in the pattern. So I believe that Let me ask you, it may be the same question, but the gray brief at page 1 compares Claim 20 to Claim 17 because it depends from Claim 17, correct? That's correct, Your Honor. And at page 1 of the gray brief, they write the only difference between the portion of Claim 17 that we're concerned with and the portion of Claim 20 that we're concerned with is the difference between an electronic input and a control signal. So what is the difference? Is there some material difference between an electronic input and a control signal? I believe so, Your Honor. First of all, again, they use different words. I believe that the electronic input The input is being received by a different device, right? That's what I understand, Your Honor. Okay, so why couldn't, though, the control signal be the thing that's the electronic input that's being received? I think that's the position of the dissent, right? Yes. Your Honor, we're seeing that for the first time in terms of it was not in the petition, there was no construction, there was no issues. You don't have an answer to that? Your Honor, I don't have an answer other than to say I believe a control signal is something that is different, and I believe that it is different than just a mere output. What is it? What is it? I mean, what is it then? I mean, you should be prepared for this question for sure. Sure, Your Honor. So I believe a control signal is something that would be controlling the device. So to give you an example of a control signal So that could be an input signal to the device? I don't know that an input signal to the device just conveys information about an input, whereas a control signal would convey, in my opinion, a control signal would convey information that would actually cause the device to take a further action. So there may be instances where those two are one and the same, but in the context of how it's written and how it's claimed, I believe just an input signal could be an indication of radiation, for example, whereas a control signal would actually convey additional information to tell the device to do something. If we can't find a material difference, what should we do? Even recognizing that the petition didn't address it and the reply didn't address it, what should we do if we think or can't tell if there's a material difference between claims the Board did expressly address and find to be unpatentable? So, Your Honor, I would get back to the burdens of the parties. The petitioner is the moving party, and the petitioner bears the burden to prove this. And so if the petitioner is going to rely upon the Board to insert arguments or is going to rely upon the appellate panel here to come up with a reason why that claim would be invalid, I think that's improper. I think it was the petitioner's job from the beginning and the outset to define exactly what it was. They don't mention a control signal. They don't even say that a control signal is defined as something. They take no position on it. They don't even address it. This is shown by Claim 13, and they've argued that the Claim 17, from which 20 depends, shows that. So I'll note that in the petition they had an incorrect, it might have just been a typo, cross-reference to the dependent claims. So they don't necessarily even address the proper dependency of the claims. So what we're kind of engaging in right now is we're trying to piece back together what could have been or what they could have meant. They just didn't say it. So I think even from the petition from the start, having an incorrect reference to the wrong dependent claim also indicates that the control signal was not addressed. I'm not sure if I answered your question, Your Honor. Okay. Thank you, Mr. Daniels. Mr. Fink, I'll give you a minute on the rebuttal on the cross-appeal. Thank you, Your Honor. So this exemplifies exactly what we're talking about, which is the patent owner can't actually tell us what the control signal is and why it would be any different than electronic input, despite this being the subject of the whole cross-appeal, red brief and the gray brief, and despite the dissent specifically saying it doesn't have any particular meaning at Appendix 149. The electronic input is produced by Claim 17-F. Of course, Claim 20 depends from Claim 17. Claim 17, the electronic input produces an electronic input of 2D position, 3D position, and some other things. Claim 13 adds a requirement of an intensity, and that creates an additional signal or adds to the signal that goes from the input circuitry. And this is exactly what the dissent pointed out at Appendix 150. Judge Melvin was very convinced that everything here is sufficient to show that. And I would just direct, Your Honor, that the cases that we cited, including in our notice of authority, suggest that even when the party bearing the burden of proof, if the evidence is there, if the evidence is arguably there, then the Board should have addressed it. But the evidence wasn't there for Claim 20 is your problem. You never pointed the Board to anything for Claim 20 for this limitation we're talking about. Respectfully, we didn't use the words correct, Your Honor. You pointed to Claim 13. We pointed to Claim 13, and we believe that that was sufficient. But you're right, we didn't use the words with that. Thank you, Your Honor. Thank you. Thank both counsel, the case is submitted.